# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### November 7, 2007 Session

## CARL ANDERSON, ED HOWELL ANDERSON, AND GARY ANDERSON
### v.
## U.S.A. TRUCK, INC., AN ARKANSAS CORPORATION, AND LONZIE E. NEAL

**An Appeal from the Circuit Court for Henderson County**
**No. 03048, 03049, 03053     Roy B. Morgan, Jr., Judge**

———

**No. W2006-01967-COA-R3-CV - Filed October 1, 2008**

———

This is a vehicular accident case. The three plaintiffs, a father and two grown sons, were riding in a truck pulling a trailer. An 18-wheeler driven by the individual defendant rear-ended the plaintiffs. In the days after the accident, all three plaintiffs sought medical treatment for back and neck pain. They filed this lawsuit against the defendants for injuries sustained in the accident. In the jury trial, after the close of the plaintiffs' proof, the trial court directed a verdict in favor of the defendants on the issue of punitive damages. At the conclusion of the six-day trial, the jury awarded two of the plaintiffs $10,000 each in damages and awarded the other plaintiff $200,000. Fault for the accident was apportioned 70% to the defendant and 30% to the driver of the plaintiffs' truck, so the plaintiffs' awards were reduced by 30%. The trial court denied the plaintiffs' motion to for additur or for a new trial. The plaintiffs now appeal, claiming that the issue of punitive damages should have been presented to the jury, that the amount of the jury's awards were *de minimus* and outside the realm of reasonableness, and that there was no material evidence to support the jury's verdict. We affirm, finding *inter alia* that the trial court did not err in directing a verdict on the issue of punitive damages, and that material evidence supported the jury's verdict.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., joined. W. FRANK CRAWFORD, J., did not participate.

Howard M. Romaine, Murfreesboro, Tennessee, for the appellant, Carl Anderson.

D. Russell Thomas and Herbert M. Schaltegger, Murfreesboro, Tennessee, for the appellant, Gary Anderson.

Nelson Layne, Tracy City, Tennessee, and of counsel on brief, Howard Romaine, Murfreesboro, Tennessee, for the appellant, Ed Howell Anderson.

Carl Wyatt and James F. Horner, Memphis, Tennessee, for the appellees, U.S.A. Truck, Inc., and Lonzie E. Neal.

## OPINION

### FACTS AND PROCEEDINGS BELOW

On May 15, 1993, Plaintiff/Appellant Ed Howell Anderson ("Mr. Anderson") was driving a Ford dump truck pulling a trailer loaded with farm tractors on Interstate 40 in Tennessee, from Palmer, Tennessee, to Apache Junction, Arizona, to perform a construction clean-up job. His adult sons, Plaintiffs/Appellants Carl Anderson ("Carl") and Gary Anderson ("Gary"), were riding in the cab of the Ford truck with him. All three had left their homes in Palmer, Tennessee, headed to Apache Junction, Arizona to do a construction clean-up job.

Meanwhile, Defendant/Appellee Lonzie Neal ("Neal") was driving a Volvo 18-wheeler tractor-trailer owned by his employer, Defendant/Appellee U.S.A. Truck, Inc. ("USA Truck") on Interstate 40 as well. Around 10:30 p.m., Neal's eighteen-wheeler rear-ended the Andersons' trailer pulled by the Ford truck, causing damage to the trailer, the truck, and the tractors being hauled. None of the Andersons received immediate medical treatment, but they had to abandon their original plans and instead drive back to Palmer, Tennessee. The next day, after they arrived home, Carl and Gary went to a local hospital emergency room to be examined for neck and back pain. A few days later, Mr. Anderson flew to Arizona in an attempt to maintain the Arizona business contract, but his back and neck pain was such that sought medical help in Arizona and had to return home.

Later in 1993, Mr. Anderson, Carl, and Gary (collectively, "Plaintiffs") each filed a lawsuit against Neal and USA Truck ("Defendants"), alleging that the Defendants were negligent in causing the accident and that they sustained personal injuries as a result of the Defendants' negligence. All three lawsuits were non-suited in 2002 and refiled in 2003.

After refiling, the three cases were consolidated. The Plaintiffs sought punitive damages, asserting that the Defendants were grossly negligent and/or reckless. The Defendants denied liability on grounds of causation and comparative negligence. They claimed that the Plaintiffs been traveling too slow on the interstate highway, in violation of statutes regarding minimum speed regulation (Tenn. Code Ann. § 55-8-154(a)). They also contended that the Plaintiffs' trailer was not properly lit and not properly secured, in violation of statutes regarding lighting (Tenn. Code Ann. § 55-9-405) and securing trailers (Tenn. Code Ann. § 55-7-114). The Defendants argued that the three Plaintiffs were participating in a joint venture and that, therefore, any negligence of Mr. Anderson as the driver should be imputed to Carl and Gary.

A six-day jury trial was conducted April 24-29, 2006. The issues raised in this appeal require us to review the extensive testimony in detail.

At the outset of the trial, testimony was solicited describing the circumstances of the accident. The officer who arrived on the scene, Trooper Earl Hammett, authenticated photographs and generally described the accident scene. He said that the posted speed limit on that portion of Interstate was 65 mph, and that the road surface was dry. Trooper Hammett testified that his first action on the accident scene was to ascertain whether there had been any injuries. No one at the scene reported any, so Trooper Hammett did not call an ambulance. A witness to the collision, David Kuehn ("Kuehn"), testified that the Plaintiffs' truck was traveling about 50 to 55 mph, and that the USA Truck vehicle was traveling about 65 mph.[1] Kuehn said that all of the trailer lights and marker lights on the Plaintiffs' trailer were operating at the time of the impact. He claimed that the road surface was dry, and that visibility was clear. Kuehn commented that the Plaintiffs' trailer was hit "pretty hard." Nevertheless, in response to Kuehn's inquiry immediately after the accident, the Plaintiffs said that they were not in pain. The Plaintiffs submitted the testimony of an expert, Leighton Sissom ("Sissom"), an electrical engineer, who testified on the operation of the Plaintiffs' trailer lights. Sisson said that the filament of the lights on the trailer indicated that the taillights and marker lights were on at the time of impact, but that the turn signal was not on.

The driver of the USA Truck eighteen-wheeler, Defendant Neal, did not appear at trial, but portions of his deposition were read into evidence. Neal testified that, as he topped the hill on the interstate just before the impact, he "saw sparks" on the highway, but did not immediately see the Plaintiffs' trailer or the taillights of the Plaintiffs' trailer. As soon as Neal saw the sparks on the highway ahead of him, he hit his brakes and reached for his radio to warn a truck traveling beside him. However, Neal could not avoid colliding with the Plaintiffs' trailer. There was an approximate three to four-second interval from the time Neal saw the sparks to the time of the collision. After the impact, Neal said, things got "out of control" due, in part, to oil from the engine of his eighteen-wheeler that spilled on the highway, and the trailer on his eighteen-wheeler began to swerve. Neal asserted that, at the time of the impact, the Plaintiffs' trailer was not attached to their Ford truck.

Each Plaintiff testified about the accident and their respective injuries. Mr. Anderson testified first. At the time of trial, he was sixty-six years old. As background, Mr. Anderson stated that he and his family had lived in Arizona for sixteen years. The family had owned a company that manufactured wood trusses for construction, and owned a trailer park as well. In 1986, those businesses were sold, and Mr. Anderson and his wife bought about 416 acres of land in Palmer, Tennessee. About twenty acres each were given to Gary and Carl, and the family cleared the land and built a home on each person's property. On the family farm, they began a nursery business, a cattle business, and built recreational homes for others to rent.

Three weeks before the accident, Mr. Anderson testified, he and his sons were hired by a contractor in Arizona to perform construction clean-up work on some houses. On the day of the accident, he and Gary and Carl were headed to Arizona for the job. He testified that the three men

---

[1]Much of the testimony, including Kuehn's, was in the form of either deposition testimony read to the jury, or video deposition played for the jury at trial. Unless there is a particular reason to identify the form of the testimony, we will not do so in our discussion of the evidence.

had formed a partnership for the venture. They were to earn $850 per house. The plan was for Mr. Anderson and Gary to do the physical labor. Carl was disabled because of a history of back problems, so they planned for him to answer telephones and contact other contractors to solicit more work while they were there. Mr. Anderson described Carl's duties on the job as being just as important as the physical labor he and Gary were expected to do.

When the accident occurred, Mr. Anderson stated, the eighteen-wheeler hit the back of his trailer, which caused his trailer to lift up and temporarily flatten his two front tires to the ground. When the truck and trailer lowered, he said, the trailer came loose from the truck, and the tractor that was being hauled in his trailer came out of the trailer. Mr. Anderson insisted that, before the accident, the trailer was tightened down completely, the safety chains were properly in place, and all of the tail lights were functioning properly. He said that he checked the lights "as often as I stopped and got gas," at least three times. Mr. Anderson estimated that, at the time of impact, he was driving about 55 mph. After the accident, the Plaintiffs all drove back home to Palmer, Tennessee.

Mr. Anderson testified that he, Gary, and Carl all suffered serious injuries as a result of the accident. A few days after the accident, Mr. Anderson claimed, he flew from Nashville to Arizona to try to save the work contract they had secured. However, when he arrived in Arizona, his back was in such pain that he went to a chiropractor instead. He claimed he was unable to move during the week after the wreck, and he ended up returning home to Tennessee after about five days, convinced that his condition was getting worse, not better. Since then, Mr. Anderson claimed, he had severe migraine headaches, muscle spasms in his neck, and numbness in his arms. Mr. Anderson discussed his efforts to get relief by visiting a variety of medical professionals, but said that the only relief he obtained was from epidurals administered to reduce the swelling in his back. In July 1997, Mr. Anderson underwent spinal fusion surgery, but it did not relieve his pain. He said that he has continued to suffer unbearable pain, he has migraine headaches, and his arms and legs occasionally go numb. Mr. Anderson claimed that all of the medical care providers he consulted told him that he had no chance for improvement. Since the accident, he said that he has not worked regularly, only performing small tasks and working until the pain forces him to stop. He reported problems driving, and said that he hires people to perform the work that needs to be done on the farm. Mr. Anderson testified that "I'm just absolutely not able to get out of the bed much less work. The pain is just unbearable."

Mr. Anderson was asked about an incident that occurred over thirty years earlier, when he fell off of a bridge. He claimed that he was not hurt in that fall. He acknowledged that he stayed in the hospital for two days after the fall, but explained that he was hospitalized only because of an allergic reaction to medicine that he was given at that time.

Mr. Anderson was also asked about an accident that occurred in September 1993, about four months after the truck accident. He stated that he was riding on a four-wheeler (all-terrain vehicle or "ATV") to the back of the farm. He was using the ATV because, since the accident, he had been unable to walk the distance to the back of his farm. He said that the four-wheeler rolled down a hill and he fell off. After that, he walked about 2,000 yards to his son's house, where an ambulance

-4-

came and took him to the hospital. He was put in a back brace and hospitalized for eight to ten days. Mr. Anderson maintained in his testimony at trial that his back was not broken in the ATV accident. However, his prior deposition testimony and other evidence indicated that he had, indeed, broken his back in the fall from the ATV. When he was discharged from the hospital, Mr. Anderson was advised by his physician to leave the back brace on for three months. Instead, he cut the brace off as soon as he was released from the hospital.

Mr. Anderson also testified about his son Gary's condition. He asserted that before the accident, Gary had "never been sick in his life," but after the accident, he "never had a well day." Gary had not been able to work, he said, because the pain was so severe. Mr. Anderson said that, in a typical day, Gary just stays home; he is not able to play with his three children or go far from home. Mr. Anderson acknowledged, however, that since the accident, Gary had worked for the State, had worked for a construction company, and had occasionally mowed yards.

Mr. Anderson also testified about his son Carl. He conceded that Carl was impaired before the accident, but asserted that Carl's back problems became worse after the accident. Before the accident, he said, Carl had not had upper back trouble, but after the accident, Carl's neck and upper back caused him debilitating pain.

Gary also testified. At the time of trial he was forty-three years old. Gary said that he began working with his father in the family business when he was about five or six years old, and that he continued to work with his father until the accident at issue in this lawsuit. Prior to the accident, Gary helped his father operate machinery, build trusses, clear the Anderson land in Tennessee, and build all three homes on it. During that time, Gary also attended theological school for about a year and worked as a minister for a time. After the accident in question, Gary said, he was unable to do any of those things.

Gary outlined the medical treatment he received for his injuries resulting from the accident. He received treatment from Dr. Jeffrey McKinley, a chiropractor, and Dr. Paul Broadstone, an orthopedic surgeon. Because of his back and neck pain, Gary saw several physicians at the Chattanooga Outpatient Center, where he underwent scans, tests, and several nerve blocks. He was prescribed substantial medication for his pain and eventually became addicted. In May 2002, he was hospitalized in the Moccasin Bend Mental Health Institution for eleven days because of the drug addiction that resulted from the treatment for his injuries.

Gary maintained that he had never experienced back pain before the accident, and asserted that he has never been free of pain in his neck or back since the accident. He conceded, however, that he suffered a back strain a year before the accident that prompted him to visit a medical professional at that time. Gary testified that the back injury he sustained in the accident at issue prevents him from working and ministering at church, camping, hiking, and fishing. He said that it impedes his ability to play with his three children the way he did before the accident because certain activities are simply too painful. The injuries have caused his marriage to suffer also. Gary

testified that the accident "ruined [his] life in every area," and that he is "actually going downhill every year."

After the accident, Gary claimed, he was unable to maintain permanent employment. Although he made some money after the accident mowing yards, working for the State as a maintenance worker and working as a welder for a private company, he was unable to sustain any position long term. Some of Gary's tax returns were submitted into evidence to show his earnings before and after the accident. Gary acknowledged that the tax returns showed that the most income that Gary had reported earning was approximately $13,000 in 1998, after the accident, and that many years before the accident he reported no income. In fact, in the months preceding the 1993 accident, he had not earned any reported income. Gary explained, however, that in 1993 he was laid off from his construction job, and in the other years he had worked primarily on the farm to build equity in the family businesses.

Gary testified about falling off of a ladder at his sister's house in November 1999, six years after the 1993 accident. He sought medical attention after the 1999 fall, he claimed, only because of a cut on his arm. Although his medical records stated that he fell a distance of twelve feet off of the ladder, Gary claimed that he fell only about three feet. He said that the fall exacerbated his back condition for about two or three days, but that it did not cause any long-term damage to his already injured back. In addition, in January 2002, Gary said he stepped into a six-inch hole, but he claimed that the incident also exacerbated his existing back condition for only two or three days.

Gary also testified about his father, Mr. Anderson, and his brother Carl. He said that before the 1993 accident, his father was in very good physical shape, but the accident caused him to stay in bed much of the time. He was aware of his father's four-wheeler accident in September 1993, but insisted that his father's poor physical condition began at the time of the truck accident. (At 579). As to his brother Carl, Gary said that Carl's pre-accident back condition had been improving before the 1993 truck accident, even though at the time he was still receiving disability benefits. Gary confirmed that, at the time of the accident, Carl was going to Arizona with he and his father to engage in sales activities, answer the telephone, and be a general troubleshooter. After the truck accident, however, Carl's existing back condition worsened.

Carl was the last of the three Plaintiffs to testify. At the time of trial, Carl was forty-two years old. In his testimony, he emphasized that he was traveling with his father and Gary to Arizona to work; he had planned to help organize the business and try to solicit more work in Arizona for the three of them. Carl specifically remembered checking the trailer, the chains, the lights, and the ball hitch on the trailer before the trip, and he recalled that everything was safely secured and operational. When the accident occurred, at the time of the impact, he felt the back end of the truck lift at least three or four feet in the air, and then he felt the trailer break free from the truck. The next day, he and Gary went to the hospital and sought treatment for back and neck pain.

Carl acknowledged that he had suffered from back injuries prior to the accident. In 1985, he said, he was working in his father's truss business and pulled his back; this necessitated two

surgeries. In 1988, he underwent back surgery for a recurrent disc herniation. After the surgeries, Carl sought medical treatment in May 1990, July 1991, and August 1991, because of continued problems, including increased low back pain and gradual increased numbness in his legs. At another visit to the doctor in April 1992, Carl reported to his doctor that he had pain in his back most of the time, and that he had significant spasms which kept him awake. Carl began receiving Social Security disability benefits because of his back problems, and was receiving such benefits when the 1993 accident occurred.

Contrary to the description of discomfort contained in his medical reports, Carl testified at trial that, at the time the accident occurred, his condition had been improving. He claimed that, prior to the 1993 accident, he was able to take walks with his children, coach their T-ball teams, plant trees, operate machinery, and help build the homes on his father's property in Tennessee.

Carl explained that, after the 1993 accident, his condition worsened to the point that he needed assistance with simple tasks such as bathing and dressing. His condition caused him to become addicted to pain medication, and he engaged in the use of illegal drugs, including methamphetamine. He was involuntarily hospitalized and admitted into a rehabilitation facility for a week to address his addictions. At the time of trial, Carl said, his back injuries were still painful, but he managed the pain by behavior modification. He still needed help bathing and dressing, either from his wife or his children, and was unable to work. In October 2000, Carl underwent another surgery on his back, and it improved his condition.

Carl testified that, to his knowledge, neither Gary nor Mr. Anderson had had any back problems before the 1993 accident. He corroborated Gary's assertion that he had never been pain free since the accident. He said that Gary tries to work, but he cannot because it causes him too much pain. Carl said that, though Gary formerly was a hard worker and an excellent machine operator, he could no longer do anything as he did before.

Several of the Plaintiffs' family members testified about the impact the accident had had on each Plaintiff's physical condition and their ability to enjoy life. Carolyn Anderson ("Mrs. Anderson"), the wife of Mr. Anderson and the mother of Carl and Gary, testified that, prior to the accident, Mr. Anderson was a "workaholic," typically working from morning until night. Mrs. Anderson said that her husband put up fences, cleared wood off their property, helped build their house and other houses on their property, built roads, planted shrubbery and trees, and otherwise maintained the property and the businesses on it. She said that Gary and Carl helped Mr. Anderson with these duties. She explained that Carl was not able to participate fully in these activities because of his prior back injury, but said that, before the accident, Carl's condition had been improving. Mrs. Anderson testified that the accident changed all of their lives completely. She said that, because of his pain, Mr. Anderson now stays in bed much of the time and does not visit neighbors or play with their grandchildren as he did before. In addition, the pain medications her husband now requires cause him to be depressed. Mrs. Anderson claimed that Gary was happy before the 1993 accident, and said that he now acts like an old man. She said that Gary no longer was physically able to help with farm work or visit the sick. She acknowledged Gary's addiction to pain medication and his stay

at the rehabilitation facility, linking both to the pain medication necessitated by the accident. Mrs. Anderson corroborated the prior testimony that Carl was on a joint enterprise with Mr. Anderson and Gary at the time the accident occurred, and that he planned to do the light work on the Arizona job. She said that Carl was a good father and a happy person but, after the wreck, all his dreams went "down the tube."

Mr. Anderson's daughters, the sisters of Gary and Carl, Victoria Anderson Atterton ("Victoria") and Kim Anderson Walker ("Kim"), testified about all of the Plaintiffs. Both sisters stated that before the 1993 accident, except for his pre-existing asthma, Mr. Anderson had no health problems and was a hard worker. After the accident, however, Mr. Anderson did not participate in work or recreational activities that he formerly enjoyed. Victoria said that, before the accident, Mr. Anderson enjoyed horseback riding, camping, fishing, and swimming, but that after the accident he could engage in none of these activities without enduring pain in his neck and back. Kim said that Mr. Anderson no longer preached at church, and that he no longer engaged in any hobbies or forms of recreation. Victoria's husband, Lewis Atterton ("Atterton"), testified that, since he married Victoria in 1996, Mr. Anderson basically does not get out of bed. Atterton said that Mr. Anderson hires him to do much of the farm work.

Victoria and Kim testified that, before the accident, Gary was Mr. Anderson's primary helper on the farm and had no health problems. As the church youth minister, he engaged in volleyball, basketball, wrestling, and hiking. After the accident, however, Gary was no longer cheerful and outgoing, had no enjoyment of life, no longer did anything. Victoria and Kim both acknowledged that Carl had a disabling condition in his back that pre-dated the 1993 accident. They insisted, however, that the accident worsened Carl's condition. Atterton testified that Gary and Carl do odd jobs for Mr. Anderson to earn extra money, but that both of them are in chronic pain. He recounted one occasion on which Gary was in so much pain that he lost all bowel control at the Attertons' home.

Robert Anderson ("Robert"), Mr. Anderson's brother and the uncle of Gary and Carl, testified about the condition of the Plaintiffs. Robert said that, before the accident, his brother did "everything," fishing, hunting, bushhogging, etc. After the accident, the pain in his neck and back limited his activities. Robert acknowledged that Mr. Anderson broke his back in the September 1993 four-wheeler accident, but indicated nevertheless that he felt that Mr. Anderson's problems began with the truck accident. Robert testified likewise that the 1993 truck accident caused Gary and Carl neck and back problems. He said that Gary had never had such problems before the accident, but since the accident did not go out like he did before. Robert also said that Carl had been in a lot of discomfort since the accident.

Gary's wife, Audrey Anderson ("Audrey"), testified on behalf of Gary. Before the 1993 truck accident, she said, Gary was in "perfect health." After the accident, his "life changed drastically." Before the accident, Audrey said, Gary worked with his father on the farm clearing the land, tending the nursery stock, running a bulldozer, and the like. Gary also took their children to the park, had picnics, and went on walks with them. Since the accident, however, Gary was in pain all day, unable

to work or play with their three children the way he did before. Audrey said that Gary feels that he has no worth, and is going downhill every day. Audrey's brother, Rodney Campbell ("Rodney"), a preacher, testified that, before the accident, he and Gary frequently went on mission trips together. After the accident, however, Gary traveled much less because of the pain, and that he developed depression as a result.

Carl's adult children, Dana Anderson ("Dana") and Derrick Anderson ("Derrick"), testified on Carl's behalf. At the time of trial, Dana was living with Carl. At the time of the 1993 accident, Dana was about eight years old. She recalled that, before the accident, Carl had coached her T-ball team and was very happy. After the accident, however, he had terrible pain in his back and became severely depressed. Dana said that, on some mornings, Carl's pain was so severe he had to crawl to the bathroom. The surgery he had undergone helped only "a little." Derrick was seven years old at the time of the 1993 accident. Derrick also remembered his father as being very happy and active. After the accident, he said, Carl was in serious pain and "really couldn't do anything any more."

The Plaintiffs each submitted expert testimony regarding their injuries. Mr. Anderson submitted the testimony of Dr. Jeffrey McKinley ("Dr. McKinley"), Dr. Gregory Ball ("Dr. Ball"), and Dr. Paul Broadstone ("Dr. Broadstone"). Dr. McKinley, a chiropractor,[2] treated Mr. Anderson twenty-three times during the time period from May 25, 1993, through September 7, 1993, for neck pain, back pain, tingling in the extremities, and headaches. Dr. McKinley said that headaches were Mr. Anderson's "chief complaint." He was unaware that Mr. Anderson had a history of migraine headaches, and that he had been treated for them as recently as 1991. Dr. McKinley said that a CT scan that he ordered for Mr. Anderson in June 1993 showed no anatomical reason for his pain, only degenerative changes in the spine that stem from "wear and tear" over time.

Dr. Ball is a physician specializing in pain management; he owns and manages a pain clinic. Dr. Ball said that Mr. Anderson first visited his pain clinic in October 2001 for help in dealing with neck pain, headaches, and pain in his lower back. Dr. Ball opined that Mr. Anderson's headaches were cervicogenic headaches, which began in his neck and were caused by the truck accident. He felt that Mr. Anderson's lower back pain was not caused by the accident. He said that Mr. Anderson would never be pain free. Dr. Ball testified that Mr. Anderson did not inform him or others at his pain clinic that he was treated for headaches during the time period from 1988 to 1993.

Dr. Broadstone, an orthopedic surgeon, first met with Mr. Anderson in 1997 for evaluation of his back. Dr. Broadstone said that Mr. Anderson complained of headaches and neck pain as well as back pain, but could not take anti-inflammatory medication because of his asthma. After Mr. Anderson's condition failed to improve after a month of therapy, Dr. Broadstone ordered a CT scan, which showed degenerative changes in Mr. Anderson's back, a condition that would be expected in a man of Mr. Anderson's age. Ultimately, Dr. Broadstone performed spinal fusion surgery on Mr. Anderson in 1997, which was successful. Two weeks after surgery, Dr. Broadstone stated, Mr. Anderson reported that "overall he felt great," though he continued to have headaches. In December

---

[2]Dr. McKinley explained that he is a doctor of chiropractic, not a medical doctor.

1997, Mr. Anderson reported that he still had headaches and experienced numbness when he engaged in activities such as using his chainsaw. Dr. Broadstone referred him to a neurologist for an evaluation of his headaches.

In March 2000, Dr. Broadstone again evaluated Mr. Anderson, this time for purposes of the upcoming trial. Dr. Broadstone said that Mr. Anderson reported to him that he had continued numbness in his hands and legs, had difficulty sleeping, and was not exercising or working. Dr. Broadstone said that, since he last treated Mr. Anderson in 1997, the only changes in his back were some degenerative changes.

Dr. Paul R. McCombs, III ("Dr. McCombs"), a neurosurgeon, testified about his treatment of Carl. Dr. McCombs first saw Carl in June 1998, five years after the 1993 truck accident. He was aware at the time that Carl had a history of back, right hip, and leg pain, and that he had prior surgeries. Carl reported to Dr. McCombs that his conditions improved after the surgeries. Dr. McCombs determined that Carl had recurrent disc herniation in the same part of his spine on which the past surgery had been performed. Though he initially resisted, Carl eventually agreed to have further surgery on his back in October 2000. After the 2000 surgery, Carl experienced a dramatic improvement in his pain. Dr. McCombs assigned Carl a 13% impairment rating to his body as a whole caused by the 1993 accident. After Dr. McCombs opined that Carl's injuries were caused by the 1993 accident, he was shown medical reports predating the accident in which Carl told medical professionals that he could not work because he had pain in his back most of the time that radiated to his legs. Dr. McCombs testified that he had not been aware that Carl was determined to be disabled by the Social Security Administration in 1988.

Gary submitted the testimony of Krista Garner, a nurse practitioner ("Garner"), Dr. David Gaw ("Dr. Gaw"), and Dr. Terry Holmes ("Dr. Holmes"). Garner became Gary's primary care provider in 2002. She testified that he complained of debilitating neck and back pain, and told her that it was caused by the 1993 accident. At trial, Garner said that Gary visited her once a month for evaluation and for pain medications. She was prescribing him Valium and Xanax for pain. She referred Gary to a specialized facility in Nashville, where he tested positive for illegal drugs, including methamphetamine. Garner said that Gary's addiction to pain medication resulted in his hospitalization from May 23, 2003, through June 2, 2003.

Dr. Gaw, an orthopedic surgeon, performed an independent medical evaluation on Gary on May 30, 2001, for purposes of trial. Much of Gary's medical history was admitted through Dr. Gaw. Dr. Gaw diagnosed Gary with chronic pain syndrome, chronic cervical, thoracic, lumbar strain, and depression. He suggested that Gary needed pain management treatment with psychological support. He put limitations on the amount that Gary could lift, and assigned him a 10% permanent medical impairment rating to his body as a whole. Dr. Gaw noted that Gary's medical reports from September and November 1993 showed normal x-rays, a normal MRI, and normal range of motion with minimal discomfort at that time. He noted that Gary told him that he had been doing some lawn work. Dr. Gaw found that Gary had incurred $44,453 in medical bills related to the 1993 accident.

Dr. Holmes, a psychiatrist, performed an independent psychological and medical evaluation on Gary in October 2001. He reviewed Gary's history, evaluated him, and determined that he had chronic pain syndrome involving his neck and lower back, and that he had clinical depression of moderate severity. He assigned Gary a Class 2 impairment, which he described as a mild impairment, for daily living. He assigned him a Class 3 impairment, which is a moderate impairment, for the ability to work. On cross examination, Dr. Holmes acknowledged seeing a report from another doctor who had told Gary he should return to work in May 1994.

Dr. Holmes reevaluated Gary in July 2004 and was questioned about reports related to Gary's ten-day stay at the Moccasin Bend Mental Health Institute, a State psychiatric hospital. Before Gary was admitted, he had not slept for nine days. During his stay at Moccasin Bend, Gary received three different diagnoses by three different doctors. One diagnosed him with bipolar disorder, another with major depression complicated by possible bipolar disorder, and the third diagnosed him with major depressive disorder recurrent with psychotic features. Gary reported to the medical professionals that he was depressed because his disability prevented him from providing for his family, and that he felt helpless, hopeless, and worthless. He reported hearing the voice of God and other voices, and contemplated suicide. Dr. Holmes acknowledged that evidence from 1993 medical reports showed no abnormalities in Gary's neck or spine and a normal range of motion.

The jury also heard expert testimony regarding each Plaintiff's inability to obtain regular employment and overall economic loss resulting from the 1993 accident. Mr. Anderson and Gary submitted testimony from a vocation expert, Nicholas Sieveking, Ph.D. ("Dr. Sieveking"), a psychologist. Dr. Sieveking concluded that Gary was "totally and permanently disabled." He said that Gary was getting worse, not better, and that he has a progressive condition not atypical of persons with depression and chronic pain disorders. Dr. Sieveking perceived Gary to be hard-working and noted that Dr. McCombs, the neurosurgeon, had described him as motivated. He acknowledged that, according to Gary's tax returns, he made no money in the years 1982-1985, and that the most he ever earned was $13,000 in 1998, but noted that, prior to the accident, Gary had been involved in building equity in the family business. Although Gary had attempted to mow lawns and maintain other jobs after the accident, Dr. Sieveking firmly believed that Gary was 100% disabled because his condition was worsening and he would not be able to work at a full-time job in the open market.

Dr. Sieveking evaluated Mr. Anderson in 2005 for purposes of trial. From his independent psychological test and the medical records he examined, Dr. Sieveking opined that Mr. Anderson was also 100% disabled. He acknowledged that Mr. Anderson was capable of doing some things, but considering the worsening of his headaches and his problems with concentration and depression, he would generally be unable to follow through. Dr. Sieveking indicated that Mr. Anderson's problems began with the 1993 truck accident, and that his condition had worsened to such a degree that he would not be able to perform any job reliably or consistently. Referring to the September 1993 four-wheeler accident, Dr. Sieveking opined that, even if that subsequent accident had not happened, it was likely that Mr. Anderson would still suffer from the same condition.

Gary submitted the testimony of an economist, Walt Rogers, Ph.D. ("Dr. Rogers"), to testify as an expert regarding Gary's loss of future income. Dr. Rogers' report, entered into evidence at trial, projected that Gary had a thirty-four-year life expectancy and that, over that period of time, the loss of income caused by his injuries from the accident would total about $544,900.

To prove his economic loss, Carl submitted the testimony of Rebecca Williams ("Williams"), a vocational expert. She interviewed Carl in September 2001, and reviewed his medical records, as well as depositions. From all of this, Williams determined that Carl had very limited job opportunities. She observed that his condition fluctuated, noting that he has "good days" and "bad days," and commented that this factor impedes his employability. She said that Carl could not expect to be employed "without some very special accommodations." Williams also observed that Carl's condition put a stress on his family as a whole. Williams estimated that Carl's loss of past earnings caused by the 1993 accident was about $35,660, and his loss of future income was about $92,087. This testimony completed the Plaintiffs' proof.

At the close of the Plaintiffs' proof, the Defendants made a motion for a directed verdict on the issue of punitive damages, arguing that insufficient evidence was adduced at trial to submit the issue to the jury. The trial court granted the motion, concluding that no evidence supported a finding of outrageous or egregious conduct on the part of the Defendants. In addition, at the close of the Plaintiffs' proof, the Plaintiffs moved for a directed verdict on the issue of whether the Plaintiffs were engaged in a joint venture, and whether any negligence by Mr. Anderson as the driver should, therefore, be imputed to Gary and Carl. They argued that neither Gary nor Carl owned the vehicle being driven by Mr. Anderson, nor did they have any control over their father's driving, and that therefore a "joint venture" instruction to the jury would be inappropriate. The trial court denied this motion, finding that the evidence was sufficient for the jury to conclude that the Plaintiffs were involved in a joint venture at the time of the accident and that, therefore, the issues should be submitted to the jury.

After the trial court's ruling on these motions, the Defendants rested their case without putting on additional proof. The case was submitted to the jury with written jury instructions.

After several days of deliberation, the jury returned a verdict awarding damages to each of the Plaintiffs in varying amounts. In total, Mr. Anderson was awarded $34,500, Carl was awarded $10,000, and Gary was awarded $203,000. The damages awarded to Mr. Anderson were designated as follows:

Non-Economic Damages
| | | |
|---|---|---|
| A. Permanent Impairment/disfigurement | $ | 1,000 |
| B. Pain and Suffering – Past | | 2,000 |
| C. Pain and Suffering – Future | | 1,000 |
| D. Loss of Ability to Enjoy Life – Past | | 1,000 |
| E. Loss of Ability to Enjoy Life – Future | | 1,000 |
| **Total Non-Economic Damages:** | $ | 6,000 |

Economic Damages
| | | |
|---|---|---|
| A. Past medical care/services | $ | 1,000 |
| B. Future medical care/services | | 1,000 |
| C. Loss of earning capacity - past | | 1,000 |
| D. Loss of earning capacity - future | | 1,000 |
| E. Property damages | | 24,500 |
| **Total Economic Damages:** | $ | 28,500 |

The jury awarded Carl similar damages for his personal injuries:

Non-Economic Damages
| | | |
|---|---|---|
| A. Permanent Impairment/disfigurement | $ | 1,000 |
| B. Pain and Suffering – Past | | 1,000 |
| C. Pain and Suffering – Future | | 1,000 |
| D. Loss of Ability to Enjoy Life – Past | | 1,000 |
| E. Loss of Ability to Enjoy Life – Future | | 1,000 |
| **Total Non-Economic Damages:** | $ | 5,000 |

Economic Damages
| | | |
|---|---|---|
| A. Past medical care/services | $ | 1,000 |
| B. Future medical care/services | | 2,000 |
| C. Loss of earning capacity - past | | 1,000 |
| D. Loss of earning capacity - future | | 1,000 |
| **Total Economic Damages:** | $ | 5,000 |

The jury awarded Gary the largest amount in damages:

Non-Economic Damages
| | | |
|---|---|---|
| A. Permanent Impairment/disfigurement | $ | 20,000 |
| B. Pain and Suffering – Past | | 20,000 |
| C. Pain and Suffering – Future | | 20,000 |
| D. Loss of Ability to Enjoy Life – Past | | 20,000 |
| E. Loss of Ability to Enjoy Life – Future | | 20,000 |
| **Total Non-Economic Damages:** | $ | 100,000 |

Economic Damages
| | | |
|---|---|---|
| A. Past medical care/services | $ | 40,000 |
| B. Future medical care/services | | 20,000 |
| C. Loss of earning capacity - past | | 20,000 |
| D. Loss of earning capacity - future | | 20,000 |
| E. Property damages | | 3,000 |
| **Total Economic Damages:** | $ | 103,000 |

On the issue of comparative fault, the jury concluded that Defendant Neal was 70% at fault for the accident, and that Mr. Anderson was 30% at fault. The jury found as a matter of fact that the Plaintiffs were engaged in a joint venture at the time of the accident. As a result, Mr. Anderson's fault was imputed to Carl and Gary.

On May 26, 2006, Plaintiffs filed a motion for a new trial or, in the alternative, to alter or amend or for an additur. The trial court denied the Plaintiffs' post-trial motions and approved the jury's verdict. The Plaintiffs all appeal.

ISSUES ON APPEAL

On appeal, the Plaintiffs raise several challenges to the trial court's decision. They argue that the trial court erred in directing a verdict on the issue of punitive damages. The also contend that it erred in excluding certain testimony by eyewitness David Kuehn that indicated that the Defendants had engaged in witness tampering. The Plaintiffs further argue that the trial court erred in denying their motion for a directed verdict on the joint venture issue and by permitting the jury to consider whether the Plaintiffs were engaged in a joint venture. In addition, they contend that the trial court erred in failing to grant their motion for an additur or for a new trial because the jury verdict was not within the range of reasonableness and was not supported by material evidence. They specifically argue that no material evidence supported the jury's finding of contributory negligence based on lack of proper lighting on the trailer, the speed of the Plaintiffs' truck, or on any other basis. Finally, the Plaintiffs argue that a series of erroneous rulings by the trial judge resulted in a denial of their constitutional right to a jury trial.

ANALYSIS

**Punitive Damages**

We first address the Plaintiffs' argument that the trial court erred in directing a verdict on punitive damages. In Tennessee, punitive damages may be awarded "only in the most egregious of cases" where the defendant has acted either intentionally, fraudulently, maliciously, or recklessly. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn.1992) . "A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all circumstances." *Id.* This type of conduct must be proven by clear and convincing evidence. *Id.*

This Court reviews the grant of a directed verdict *de novo*, utilizing the same standard as employed by the trial court. *Biscan v. Brown*, 160 S.W.3d 462, 470 (Tenn. 2005). A directed verdict may be granted "only when the evidence in the case is susceptible to but one conclusion." *Id.* (quoting *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002)). The Court must take the strongest legitimate view of the evidence in favor of the non-moving party, permitting all reasonable inferences in his favor, and disregarding any evidence to the contrary. *Id.*; *see Conaster v.*

-14-

*Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995) (citing ***Williams v. Brown***, 860 S.W.2d 854, 857 (Tenn. 1993)). When a court is called upon to determine a motion for a directed verdict on the issue of punitive damages, it is "required to determine whether there was material evidence of a clear and convincing nature to support an award of punitive damages," while still viewing the evidence in the light most favorable to the non-moving party. ***Wasielewski v. K Mart Corp.***, 891 S.W.2d 916, 919 (Tenn. Ct. App. 1994).

The Plaintiffs argue that the trial court failed to view the evidence in their favor and ignored evidence that Defendant Neal was reckless or grossly negligent in the manner in which he operated his truck. They assert that the evidence clearly showed that the lights on their truck and trailer were operating properly, and that Neal admitted that he had three or four seconds prior to the collision to apply his brakes but nevertheless failed to avoid the well-lit vehicle. The Plaintiffs also argue that the trial court erred in excluding some testimony by eyewitness David Kuehn indicating that the Defendants attempted to have Kuehn testify falsely at trial, and they contend that this evidence would have further supported a finding of punitive damages. Thus, the Plaintiffs argue, because a reasonable juror could have concluded that Neal acted with the requisite recklessness or gross negligence to support a punitive damage award, the trial court erred in directing a verdict on this issue.

We must first determine whether the trial court erred in erred in excluding a portion of Kuehn's testimony. We review this issue for an abuse of discretion. ***See Bronson v. Umphries***, 138 S.W.3d 844, 851 (Tenn. Ct. App. 2003) (holding that the trial court's decision to admit or reject evidence is reviewed for an abuse of discretion).

The Plaintiffs contend that the excluded testimony showed that the Defendants improperly attempted to influence Kuehn's testimony. The testimony read as follows:

> Q:  What if any contact have you had with the driver of the Volvo vehicle since that night [of the accident]?
> A:  I haven't had contact with him. They contacted me months later – somebody did, I can't recall who it was – wanting me to testify for U.S.A. Said – you know, I can't recall what they was asking me. And I said I can't do that because that wasn't true.
> Q:  What wasn't true?
> A:  What they were asking me. I remembered that. I can't remember exactly what they asked me, but they was wanting me to testify for them and just my view of what happened.
>      It was U.S.A. Trucking's fault, you know. That's my professional opinion . . . .

The trial court found that this testimony was inadmissible because it lacked specificity, noting that Kuehn could not recall who asked him to testify, nor could he recall what the person asked him to say. The testimony is self-evident. Kuehn admitted that he had not had personal contact with

-15-

Defendant Neal since the accident, and that he could not recall what the "somebody" who called him asked him to say about the case. We agree with the trial court's exclusion of this testimony and find that the trial court did not abuse its discretion.

We now must examine whether the remaining evidence in the record would support a finding of punitive damages. In some limited circumstances, Tennessee courts have allowed claims for punitive damages to go to the jury in automobile accident cases. For example, a punitive damage award was found to be justified where the driver of the defendant's vehicle had a blood alcohol level of .15% at the time of the accident, and where the evidence showed also that the defendant had been smoking marijuana prior to the accident. *See Perry v. Dewey*, No. 02A01-9406-CV-00142, 1995 WL 422660, at *3 (Tenn Ct. App. 1995) (alcohol); *Worley v. Pharris*, No.155, 1991 WL 148046, at *3 (Tenn. Ct. App. 1991) (marijuana); *see also Sakamoto v. N.A.B. Trucking Co.*, 717 F.2d 1000, 1002-03 (6th Cir.1983) (applying Tennessee law, affirming an award of punitive damages where the defendant driver was an habitual user of amphetamines and had been without sleep for 40 hours before the accident). Claims for punitive damages are generally denied in cases where only proof of simple negligence was submitted at trial. For example, in *Rose v. Lydon*, No. 227, 1986 WL 4595 (Tenn. Ct. App. 1986), the appellate court affirmed the trial court's refusal to submit a punitive damages claim to the jury when the proof showed only that the defendant driver was negligent in his failure to see the plaintiff's vehicle just before impact. *Rose*, 1986 WL 4595, at *3.

In the instant case, the proof at trial showed that Defendant Neal was traveling about 65 mph, which was the posted speed limit. This speed, without more, would not support a finding of recklessness or gross negligence. There was no evidence of any extenuating circumstances, such as the involvement of drugs or alcohol, to justify a finding of "reckless" or "grossly negligent" behavior. "[I]t takes something far greater than lack of ordinary care to sustain an award for punitive damages." *Richardson v. Gibalski*, 625 S.W.2d 715, 717 (Tenn. Ct. App. 1979). Thus, even viewing the evidence in a light most favorable to the Plaintiffs, it would not support an award of punitive damages under current Tennessee law. Consequently, we affirm the trial court's decision to direct a verdict on punitive damages.

## Joint Venture

Next, Carl and Gary argue on appeal that the trial court erred in denying their motion for a directed verdict on the issue of whether they were engaged in a joint venture with their father at the time of the 1993 accident.[3] We reiterate that, when faced with a motion for a directed verdict, the trial court is obligated to take the strongest legitimate view of the evidence in favor of the non-moving party, disregarding all evidence to the contrary. A directed verdict is warranted if reasonable

---

[3]The Defendants argue that the joint venture issue was waived by Carl and Gary because they did not list the issue in their motion for a new trial. The Plaintiffs point out, however, that in post-trial orders entered by the trial court, the trial court specifically addressed this argument and denied the Plaintiffs' request for post-judgment relief on the issue of joint venture. Considering this record as a whole, we find that the issue was raised and addressed by the trial court in post-judgment proceedings, and that the issue, therefore, is properly before us.

minds could reach only one conclusion on the relevant issue. *Gaston v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 819 (Tenn. 2003).

Under the joint venture doctrine, "the negligence of one member [of the joint venture] is imputed to all of the other members." *Fain v. O'Connell*, 909 S.W.2d 790, 793 (Tenn. 1995). To establish the existence of a joint venture among several parties, the Defendants must show that there is (a) a common purpose, (b) some manner of agreement among them, and (c) an equal right on the part of each to control both the venture as a whole and the relevant instrumentality. *Cecil v. Hardin*, 575 S.W.2d 268, 271 (Tenn. 1978). "Liability predicated on a joint venture theory of mutual responsibility is not imposed in instances in which the parties join together purely for pleasure, but is reserved, rather, for cases in which the parties associate for business, or expense sharing, or some comparable arrangement." *Id.* at 272. The concept of a "joint venture" was described in *Fain v. O'Connell*:

> A joint venture is an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, but without creating a partnership in the legal or technical sense of the term, or a corporation, and they agree that there shall be a community of interest among them as to the purpose of the undertaking, and that each coadventurer shall stand in the relation of principal, as well as agent, as to each of the other coadventurers, with an equal right of control of the means employed to carry out the common purpose of the adventure.

909 S.W.2d at 793 (quoting 30 Am. Jur., p. 939, Sec. 2)).

Gary and Carl argue that the evidence at trial did not support a finding of joint venture because there was no evidence that either of them had the "right to control" the vehicle driven by Mr. Anderson. They point out that Mr. Anderson owned the truck and that they were mere passengers, and they maintain that Mr. Anderson had sole control over the vehicle. They argue further that they were not yet engaged in the business venture in Arizona; they were merely preparing for it. Therefore, they were not at the time of the accident engaged in a "joint venture." In response, the Defendants argue that ample evidence was submitted for the jury to find that the Plaintiffs were engaged in a joint venture at the time of the accident. In any event, Defendants argue, even if the trial court erred in this respect, any such error would be harmless, because the awards to Carl and Gary would have been reduced by 30% regardless of whether the trial court had found that the Plaintiffs were involved in a joint venture.

We agree that any error by the trial court in permitting the jury to consider whether the Plaintiffs were involved in a joint venture was harmless in light of the jury's ultimate apportionment of fault. The jury found that Defendant Neal was 70% at fault, and that Mr. Anderson was 30% at fault for the truck accident at issue. Therefore, each Plaintiff would be entitled to only 70% of his

damages from the Defendants under the doctrine of comparative fault adopted by Tennessee in ***McIntyre v. Balentine***, 833 S.W.2d 52 (Tenn. 1992), regardless of whether a joint venture existed among them. The Defendants correctly note that this issue would not have been harmless had the jury found Mr. Anderson to have been 50% or more at fault. Such an allocation of fault would have completely barred Mr. Anderson's claim, and the issue of whether the claims of Carl and Gary were barred might have hinged on whether they were engaged in a joint venture at the time of the accident.[4] However, because the jury did not go so far as to find Mr. Anderson 50% or more at fault, the judgment ultimately entered in favor of Carl and Gary was the same as if the trial court had granted their motion for a directed verdict on the issue of joint venture. Therefore, we conclude that any alleged error in this regard was harmless, and we will not disturb the judgment on this basis. ***See*** Tenn. R. App. P. 36(b).

## Additur/Approval of Verdict

We next address the Plaintiffs' argument that the trial court erred in declining to award them an additur and in approving the jury verdict. Where the trial court simply approves the jury's verdict and denies a motion for an additur and/or a new trial, without more, we must "presume that the trial court properly discharged its duty as thirteenth juror, ***Holden v. Rannick***, 682 S.W.2d 903, 905 (Tenn. 1984), and limit our factual review to determining whether the record contains material evidence that supports the verdict." ***Pettus v. Hurst***, 882 S.W.2d 783, 788 (Tenn. Ct. App. 1993); ***see Overstreet v. Shoney's, Inc.***, 4 S.W.3d 694, 718 (Tenn. Ct. App. 1999). The appellate court will neither reweigh the evidence nor decide where the preponderance of the evidence lies. ***Barnes v. Goodyear Tire & Rubber Co.***, 48 S.W.3d 698, 704 (Tenn. 2000). "Instead, they determine whether there is any material evidence to support the verdict, and, if there is, they must affirm the judgment." ***Overstreet***, 4 S.W.3d at 718. Thus, in applying the "material evidence" standard, this Court must (1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all countervailing evidence. ***Crabtree Masonry Co. v. C & R Constr., Inc.***, 575 S.W.2d 4, 5 (Tenn. 1978); ***see also Foster v. Bue***, 749 S.W.2d 736, 741 (Tenn. 1988). We will address the merits of each Plaintiff's case in turn.

### *Ed Howell Anderson ("Mr. Anderson")*

As noted above, Mr. Anderson was awarded a total of $10,000 for permanent impairment, pain and suffering (past and future), loss of ability to enjoy life (past and future), medical care (past

---

[4]Whether a joint venture existed would also have been relevant had Gary and/or Carl filed a cross-claim against Mr. Anderson. Had either of them done so, they might have been entitled to seek recovery against Mr. Anderson for the remaining 30% of his damages if the parties were not engaged in a joint venture. ***See Fain***, 909 S.W.2d at 792 (noting that a finding of a joint venture bars suits by a non-negligent member of a joint venture against the other members of the venture). In this record, however, no cross-claims by Carl and Gary were filed against Mr. Anderson.

and future), and loss of earning capacity (past and future).[5] He asserts on appeal that no evidence at trial supports such a *de minimus* damage award. Rather, he claims, the overwhelming evidence showed that he had been an active, hard working farmer and businessman, and that it all came to an abrupt end when he suffered the injuries caused by the 1993 truck accident. Mr. Anderson argues that the evidence at trial showed that his past medical expenses related to the accident were much more than the $2,000 jury award. Similarly, he argues, his loss of earning capacity should have been valued at a minimum of $420,000, in accordance with the expert testimony of Dr. Sieveking, and that his future loss of earning capacity should have been much more than the $1,000 awarded by the jury. His evidence of these losses, he argues, was not challenged at trial and should have been credited by the jury. Mr. Anderson also argues that the evidence at trial supported a much higher award for having a permanent impairment, for his past and future pain and suffering, and his past and future loss of ability to enjoy life. Considering that he had a life expectancy of about sixteen more years, and the fact that he would spend his remaining years in pain and with a lingering disability, Mr. Anderson argues that the *de minimus* amount of damages awarded by the jury was inconsistent with the evidence and outside the realm of reasonableness.

In response, the Defendants argue that the record is replete with evidence to support the amount of the jury's award to Mr. Anderson. They cite to evidence of Mr. Anderson's physical health prior to the 1993 truck accident, as well as incidents both before and after the accident that contributed to his overall impairment. They specifically cite evidence that Mr. Anderson harmed his back when he fell from the bridge some thirty years before the 1993 truck accident. They also point to evidence of the ATV accident just months after the truck accident, in which Mr. Anderson broke his back. The Defendants note evidence that Mr. Anderson's back surgery was related to degenerative changes in his back, not to the truck accident at issue. Also, the Defendants argue, material evidence showed that any injury suffered by Mr. Anderson in the truck accident did not affect his earning capacity to the extent that he claims, specifically citing his tax records, which show that his income increased significantly *after* the accident. In light of all of this evidence and the applicable standard of review, the Defendants argue, the jury's verdict should not be disturbed.

After a careful review of the record, we must conclude that material evidence supports the jury's damage award to Mr. Anderson for his injuries caused by the truck accident. Certainly, much testimony adduced at trial supported Mr. Anderson's claims, particularly the lay testimony of his family members. Other material evidence, however, indicated that he suffered some level of disability prior to the accident at issue, and that he suffered a more serious injury afterward that was not related to the 1993 truck accident. For example, the fact that Mr. Anderson fell off of a bridge over thirty years prior, requiring immediate medical attention, is undisputed. A 1988 medical record of Mr. Anderson notes that his history was "complicated by the fact that the patient had a previous injury with a fractured neck and a fracture of the dorsal area." This "previous injury" is an apparent allusion to the bridge incident. In another 1988 medical record, Mr. Anderson sought treatment from a healthcare provider, complaining that he could not move his arm, could not eat, and was becoming blind in his left eye. Furthermore, in a 1992 medical record, just one year before the accident, Mr.

---

[5]The jury also awarded Mr. Anderson $24,500 in property damage, but this amount is not at issue in this appeal.

Anderson was described as a "52-year-old white male, disabled farmer, disabled over the last seven or eight years, working intermittently to make ends meet." Material evidence also showed that Mr. Anderson had a history of migraine headaches well prior to the accident, and that he visited a physician for this condition some sixteen times during the five years prior to the accident.

It is undisputed that, at the scene of the accident, Mr. Anderson reported no injuries. He immediately drove a substantial distance home, and the next day boarded a plane for Arizona. Only upon arriving in Arizona did he feel it necessary to seek medical attention. A few months later, in September 1993, Mr. Anderson was involved in the ATV accident that unquestionably caused serious damage to his body. After walking to his son's house a substantial distance away, he was transported by ambulance to a hospital suffering unbearable pain. After an extended hospital stay, Mr. Anderson returned home. Although his treating physician recommended that he keep the brace on his broken back for three months, Mr. Anderson immediately removed the brace. From this evidence, the jury could have concluded that the majority of Mr. Anderson's damages were the result of the broken back he suffered in the ATV accident combined with the failure to follow his doctor's recommendation, rather than the soft tissue injury suffered in the 1993 truck accident.

The jury was charged with the responsibility of considering all of the evidence submitted at trial, weighing the witnesses' credibility, and assigning each Plaintiff the appropriate portion of damages attributable to the Defendants' negligence. In other words, the jury was to assess the severity of Mr. Anderson's injuries and determine whether his damages – for permanent impairment, past and future pain and suffering, past and future loss of ability to enjoy life, past and future medical care, and past and future loss of earning capacity – were caused by factors other than the truck accident. ***See Flowers v. Turner***, No. W2001-01429-COA-R3-CV, 2003 WL 135055, at *4-6 (Tenn. Ct. App. Jan. 14, 2003). We conclude that there was material evidence to support the amount of damages awarded to Mr. Anderson, and find therefore that the trial court did not err in either approving the jury verdict or in declining to suggest an additur for Mr. Anderson.

### *Carl Anderson*

Like Mr. Anderson, the jury awarded Carl Anderson a total of $10,000 for permanent impairment, pain and suffering (past and future), loss of ability to enjoy life (past and future), medical care (past and future), and loss of earning capacity (past and future). Carl acknowledges that his back condition had rendered him disabled before the 1993 truck accident occurred. He asserts, however, that the evidence at trial showed that, before the truck accident, he had sufficient mobility to enjoy life with his children and manage his own affairs. The 1993 accident re-ruptured his disc and vastly increased his disability and pain. Although the surgery Carl had in 2000 restored some of his ability to function, he argues that he should be compensated by a damage award for the years of pain and suffering he endured between 1993 and 2000 in an amount exceeding the award by the jury. Thus, he claims, the damages awarded to him were not in the range of reasonableness and were not supported by the evidence.

The Defendants claim that substantial and material evidence supports the jury's $10,000 award to Carl. They point out that, like the other Plaintiffs, Carl did not immediately complain of any injury at the scene of the accident, nor did he seek medical attention until the next day. In addition, although Carl testified that he had been improving physically prior to the accident, much evidence to the contrary was submitted. The undisputed evidence showed that Carl had undergone several back surgeries prior to the 1993 accident, and that at all relevant times before the accident, he maintained that he was unable to work and accordingly received Social Security disability benefits because of his condition. The picture was further complicated by the evidence showing that Carl was hospitalized for using illegal drugs, including methamphetamine. This evidence tended to show that Carl's injuries were related to his pre-existing condition and/or his illegal drug use, rather than the 1993 truck accident. In addition, evidence showed that Carl was involved in another incident between 1993 and 1997, in which he and his friend "had run off the road and hit a ditch and bounced back up on the road. It didn't do no damage. It just made me tense up." Nevertheless, Dr. McCombs' diagnosis of Carl's recurrent disc herniation was made on June 8, 1998, several years after that incident.

Considering the record as a whole, we must conclude that the record contains material evidence to support the amount of the jury's award to Carl for the injuries he sustained in the 1993 truck accident. The record contains material evidence supporting the conclusion that the lion's share of Carl's damages stemmed from his pre-existing condition, complicated further by the post-accident incident and the illegal drug use. Under these circumstances, we cannot conclude that the trial court erred in approving the jury verdict on Carl's damages or in declining to suggest an additur.

### *Gary Anderson*

The jury awarded Gary Anderson a total of $200,000 for permanent impairment, pain and suffering (past and future), loss of ability to enjoy life (past and future), medical care (past and future), and loss of earning capacity (past and future).[6] Though his award was substantially higher than the other two Plaintiffs, Gary nevertheless argues that the trial court erred in declining to suggest an additur or grant a new trial because the damages awarded to him were "far below the range of reasonableness" and did not adequately compensate him for his injuries. Gary asserts that, prior to the accident, he was a lay Methodist minister, active father of three children, and a hard-working family man, builder, and farmer. The truck accident at issue caused a devastating injury that "ruined his life," preventing him from working on the farm, operating heavy machinery, and enjoying his youth ministry and other hobbies. He also points to the evidence that his resulting chronic pain led to depression and considerable emotional difficulties, ultimately causing him to be hospitalized in a mental facility. Gary cites the expert testimony he submitted showing that his past and future loss of income should have been valued at an amount between $300,000 and $800,000, and he notes that he requested over $2 million for past and future pain and suffering. He asserts that his damage claims were virtually unchallenged by the defense. In light of all of this, Gary maintains that the jury's damage award of $200,000 was woefully inadequate and should be overturned.

---

[6]The jury also awarded Gary $3,000 for property damage, but this amount is not at issue in this appeal.

The Defendants argue in response that the record contains material evidence that supported the jury's verdict on Gary's damages. As with the other two Plaintiffs, Gary did not appear to be injured at the scene of the accident; he did not seek medical attention until the following day. Lumbar x-rays taken three months after the accident were normal. A September 1993 medical report, several months after the truck accident, indicated that Gary had "normal range of motion of the cervical spine, with minimal if any discomfort." The MRI taken the next month was also normal. A medical report dated May 1994 indicated that Gary was encouraged to return to work. After the accident, Gary was able to hang cabinets in his own home, and he continued to work on the family farm loading hay and doing other chores. The Defendants also point to the evidence that Gary fell off of a ladder at his sister's house in November 1999, and that this incident necessitated him staying in bed for five or six days. At some point after the 1993 truck accident, Gary was also diagnosed with a hernia, which further contributed to his pain and discomfort. In his testimony, Gary first denied ever injuring his back prior to the 1993 truck accident, and then he admitted on cross-examination that he had visited a doctor a year before the accident because he strained his back "moving something." The Defendants argue that all of this evidence shows that Gary's injuries were either not related to the accident or were not as severe as claimed.

The verdict as it relates to Gary is obviously different from the verdicts for Mr. Anderson and Carl; Gary received an award of more than a *de minimus* amount, albeit far less than he requested. This indicates that the jury credited evidence that Gary suffered significant injuries as a result of the 1993 accident, though perhaps not the degree of injury that he claimed at trial. Notably, the jury awarded Gary $40,000 for past medical expenses, close to the $44,453 he sought. Nevertheless, material evidence supports the jury's discounting of Gary's claimed damages based on contradictory evidence regarding the cause of his injuries, the severity of his injuries, his ability to work after the accident, and his participation in family life.

Thus, although Gary submitted substantial evidence showing that the 1993 truck accident at issue caused him debilitating pain and other losses, material evidence was also submitted indicating that Gary's suffering was either not as severe as he claimed or was due in part to factors other than the truck accident. Therefore, we cannot conclude that the trial court erred in either approving the jury's verdict as to Gary's damages or in declining to suggest an additur.

Therefore, as to all three Plaintiffs, while they submitted substantial evidence to support their claims, we are not permitted on appeal to re-weigh the evidence or decide that the evidence preponderated in the Plaintiffs' favor. We may consider only whether there was material evidence to support the jury's verdict. Finding such material evidence, we must affirm the damage award as to all three Plaintiffs.

### Speed and Lighting of Plaintiffs' Vehicle

Finally, the Plaintiffs argue that the trial court erred in permitting the jury to consider as factors contributing to the accident either (1) the propriety of the lighting on their trailer or (2) the speed of their vehicle at the time of the accident. As noted above, the jury found that Mr. Anderson

was 30% at fault for the accident, and as a result the Plaintiffs' damage awards were reduced by that percentage. We review this argument under the "material evidence" standard of review, just the same as a challenge to any other part of the jury's verdict. Thus, "[w]e will not second-guess the allocation of fault by a jury if it is supported by any material evidence." **Dunn v. Davis**, No. W2006-00251-COA-R3-CV, 2007 WL 674652, at \*4 (Tenn. Ct. App. Mar. 6, 2007). Indeed, it has been noted wryly that a challenge to "a jury's allocation of fault is the legal equivalent of a 'Hail Mary' pass." **Braswell v. Lowe's Home Ctrs., Inc.**, 173 S.W.3d 41, 43 (Tenn. Ct. App. 2005).

The Plaintiffs assert that the record contains no material evidence to support an allocation of fault to them based on the lack of lighting on their trailer. They maintain that the overwhelming evidence showed that the trailer was properly lit. Each of the Plaintiffs testified that the trailer was properly lit, and that they checked to ensure that the lighting was working properly each time they stopped the vehicle. David Kuehn, the eyewitness, corroborated this testimony and said that he observed that the lights on the Plaintiffs' vehicle and trailer were operational. Moreover, the Plaintiffs' expert, Leighton Sissom ("Sissom"), testified that he examined the filaments of the trailer's lights and determined that the tail lights and marker lights were on at the time of impact. The only evidence to the contrary was Defendant Neal's deposition testimony, entered into evidence at trial, in which he said that he did not see the Plaintiffs' tail lights, that he only saw sparks on the highway, from which it could be inferred that the lights on the Plaintiffs' trailer were not on.

As to the speed of the Plaintiffs' vehicle, the evidence at trial established that the Plaintiffs' vehicle was traveling between 50 and 58 mph at the time of the accident. The Plaintiffs argue that, because this speed was not below any "minimal" speed limit, this factor should be considered as evidence of the Plaintiffs' comparative fault for the accident.

The Defendants do not dispute that Defendant Neal was the only witness to contradict the Plaintiffs' evidence that their lights were operational. They note, however, that they pled as an affirmative defense the negligence *per se* of the Plaintiffs for their failure to comply with Tennessee Code Annotated § 55-9-405, regarding the appropriate lighting for trailers. The statute states:

> (c) Every semitrailer or full trailer eighty inches (80") or more in overall width, except converter dollies, shall be equipped as follows:
>
> (1) On the front, two (2) clearance lamps, one (1) at each side;
>
> (2) On the rear, two (2) tail lamps, one (1) at each side; two (2) stop lamps, one (1) at each side; two (2) turn signals, one (1) at each side; two (2) clearance lamps, one (1) at each side; two (2) reflectors, one (1) at each side; and three (3) identification lamps, mounted on the vertical centerline of the vehicle; provided that the identification lamps need not be lighted if obscured by another vehicle in the same combination . . . .

T.C.A. § 55-9-405(c) (2004).

The Defendants point out that Mr. Anderson testified that his trailer was eight feet wide, which would confirm the applicability of this statute. The undisputed evidence at trial showed that the Plaintiffs were not in compliance with this statute, because there were neither lights in the center of the back of the trailer. Consequently, the jury was properly permitted to consider improper lighting as a factor that contributed to the accident in question.

The Defendants also note that they pled as an affirmative defense that the Plaintiffs were negligent *per se* in violating Tennessee Code Annotated § 55-8-154(a), which provides that "[n]o person shall drive a motor vehicle at such a slow speed as to impede the normal and reasonable movement of traffic, except when reduced speed is necessary for safe operation or in compliance with the law." T.C.A. § 55-8-154(a) (2004). The Defendants assert that, although there is no statutory "minimum speed," the Plaintiffs were not permitted to drive so slowly so as to impede normal, reasonable movement of traffic, and that this finding of fact was within the purview of the jury. The evidence showed that the Defendants were traveling at 65 mph, the posted speed limit on that highway. Thus, the Defendants argue, there was evidence from which the jury could conclude that the Plaintiffs were traveling at such a slow speed so as to impede traffic and/or contribute to the accident in question.

In determining whether there was material evidence to support the jury's verdict, we must take the strongest legitimate view of all of the evidence in favor of the verdict and allow all reasonable inferences to sustain the verdict. Here, there was evidence that the Plaintiffs' trailer was either not lit at all or that the lighting on the trailer did not conform to the requirements of the applicable statute. The evidence also showed that Mr. Anderson was driving at ten to fifteen mph below the posted speed limit of 65, while Defendant Neal was traveling at the posted speed limit. From all of this evidence, a reasonable juror could find that a combination of poor lighting and a slow speed by the Plaintiffs could have contributed to the accident. Under these circumstances, we must affirm the trial court's allocation of 30% fault to Mr. Anderson.

## CONCLUSION

In sum, we find that the trial court did not erred in excluding the portion of David Kuehn's deposition testimony on "witness tampering," and that it did not err in directing a verdict in favor of the Defendants on the issue of punitive damages. We conclude that any error committed in permitting the jury to consider the issue of whether the Plaintiffs were involved in a joint venture was harmless, and that the trial court did not err in approving the jury verdict and in declining to suggest an additur. We find further that the trial court did not err in permitting the jury to consider whether the Plaintiffs were comparatively at fault for inadequate lighting on the trailer and improper vehicle speed. In light of these conclusions, we reject the Plaintiffs' claim that the trial court's erroneous rulings resulting in the denial of their constitutional right to a jury trial. All other issues on appeal are pretermitted by these holdings.

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellants Carl Anderson, Ed Howell Anderson, and Gary Anderson, and their sureties, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE